# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 37869

THOMAS O'SHEA and ANNE DONAHUE
O'SHEA, Trustees of the Thomas and Anne
O'Shea Trust u/d/t DATED NOVEMBER 2,
1998; GRANDVIEW CREDIT, LLC, a
California limited liability company; CALEB
FOOTE, an individual; KATE LARKIN
DONAHUE, an individual; JOHN KEVIN
DONAHUE, an individual; and SAN
FRANCISCO RESIDENCE CLUB, INC., a
California corporation;,

    Plaintiffs-Appellants,

v.

HIGH MARK DEVELOPMENT, LLC, an
Idaho limited liability company; GORDON
ARAVE, individually and as Member of High
Mark Development, LLC; JARED ARAVE,
individually and as Member of High Mark
Development, LLC; BENJAMIN ARAVE,
individually and as Member of High Mark
Development, LLC,

    Defendants-Respondents.

)
)   Boise, February 2012 Term
)
)
)   2012 Opinion No. 67
)
)   Filed: April 26, 2012
)
)   Stephen W. Kenyon, Clerk
)

Appeal from the District Court of the Seventh Judicial District of the State of
Idaho, in and for Bonneville County. The Hon. Joel E. Tingey, District Judge.

The judgment of the district court is affirmed.

C. Timothy Hopkins; Hopkins Roden Crockett Hansen & Hoopes, PLLC; Idaho
Falls; argued for appellants.

Richard J. Armstrong; Wood Jenkins LLC; Salt Lake City, Utah; argued for
respondents.

EISMANN, Justice.

This is an appeal from a judgment in favor of the defendants in an action alleging fraud and breach of contract in connection with the sale of a commercial building. We affirm the judgment of the district court.

## I.

### Factual Background

High Mark Development, LLC, is an Idaho limited liability company whose members include Gordon Arave, Mark Arave, and Jared Arave. High Mark was the owner of a commercial building located in the City of Ammon, a suburb of Idaho Falls. On June 20, 2006, it had leased a portion of the building to The Children's Center, Inc., for a period of ten years commencing on June 19, 2006.

In June 2007, High Mark listed the real property for sale through its realtor. Thomas O'Shea, a resident of California, learned of the property through a realtor friend in Boise. Mr. O'Shea and his wife, Anne, were trustees of the "Thomas and Anne O'Shea Trust u/d/t Dated November 2, 1998," which they had formed to protect their assets and provide for their children. They decided to purchase the real property.

On August 14, 2007, the Trust entered into a real estate contract agreeing to purchase the property from Seller for $3,700,000.00. The remaining Plaintiffs, Grandview Credit, LLC, a California limited liability company; San Francisco Residence Club, Inc., a California corporation; Caleb Foote; Kate Donahue; and John Donahue, all agreed to invest in the property. When the transaction closed, the deed listed the Trust and the investors as grantees, taking the property as tenants in common with varying percentages of interest. The negotiations and exchange of information were conducted primarily through the Plaintiff's realtor and High Mark's realtor, with Mr. O'Shea being the spokesperson for the investors.

The sale of the real property closed on December 10, 2007. The Children's Center did not make any payments to Plaintiffs after they acquired the property. On March 1, 2008, the Children's Center vacated the property, and shortly thereafter it went out of business.

On July 8, 2008, Plaintiffs filed this action against High Mark and two of its principals, Gordon Arave and Benjamin Arave. Plaintiffs later added Jared Arave as a defendant by filing an amended complaint. The focus of the litigation was that the Defendants had induced the Plaintiffs to acquire the property by providing false information that the Children's Center was

2

current in its payments of rent and/or concealing or failing to disclose that the Center had failed to pay all rent due under the lease. The Plaintiffs alleged claims for breach of contract and fraud by misrepresentation and nondisclosure against all of the Defendants, but the issues were narrowed after cross motions for summary judgment. The case was tried to a jury on the issues of: High Mark's breach of contract; High Mark's alleged fraud by misrepresentation and nondisclosure; Gordon Arave's alleged fraud by misrepresentation and nondisclosure; and Benjamin Arave's alleged fraud by nondisclosure. The jury returned verdicts in favor of all of those Defendants. The Plaintiffs filed a motion for a judgment notwithstanding the verdict on the issue of liability or, in the alternative, for a new trial, which the district court denied. The Plaintiffs then timely appealed.

## II.

### Did the District Court Err in Denying the Plaintiff's Motion
### for a Judgment Notwithstanding the Verdict?

When a trial court decides a motion for a judgment notwithstanding the verdict, it cannot weigh the evidence or pass on the credibility of witnesses. *Weinstein v. Prudential Prop. and Cas. Ins. Co.*, 149 Idaho 299, 327, 233 P.3d 1221, 1249 (2010). It must simply determine whether reasonable minds could have reached the same conclusion as the jury when the evidence and all reasonable inferences that can be drawn therefrom are considered in the light most favorable to the nonmoving party. *Id*. We use that same standard when reviewing the trial court's ruling on the motion. *Id*. at 315, 233 P.3d at 1237.

### A.

### The Fraud Claim.

**1. False Statement.** The jury was asked to decide whether the Plaintiffs had proved, by clear and convincing evidence, that High Mark had committed fraud, either by misrepresentation or by failure to disclose; that Gordon Arave had committed fraud, either by misrepresentation or failure to disclose; and that Benjamin Arave had committed fraud by failure to disclose. The jury found that the Plaintiffs had not proved those claims. In their motion for a judgment notwithstanding the verdict, the Plaintiffs asked for a judgment establishing liability for fraud against High Mark on the claim of fraud by both misrepresentation and nondisclosure and

3

against Gordon Arave on the claim of fraud by nondisclosure. The district court denied that motion. In their initial brief on appeal, the Plaintiffs listed as an issue the district court's denial of that motion. However, they only addressed their claim that High Mark committed fraud by making false representations. Therefore, we will not address the district court's denial of the motion with respect to High Mark's and Mr. Arave's alleged fraud by nondisclosure. *Inama v. Boise County ex rel. Bd. of Comm'rs*, 138 Idaho 324, 330, 63 P.3d 450, 456 (2003) ("We will not consider issues cited on appeal that are not supported by argument and propositions of law").

The only claim of fraud argued on appeal is High Mark's alleged fraud in making a false representation. Under the facts shown in the record, the Thomas and Anne O'Shea Trust u/d/t Dated November 2, 1998, did not have a fraud claim based upon an alleged false representation. There were no representations that could have fraudulently induced Mr. O'Shea on behalf of the Trust to enter into the purchase contract. The only alleged misrepresentations that occurred prior to the execution of the real estate contract were: (a) the internet posting advertising the property for sale, which was created by High Mark's realtor, and (b) a statement by the realtor to the Plaintiffs' realtor that, "as far as he knew," the tenant had made all of the rental payments. In connection with the Defendants' motion for summary judgment, the district court determined that the internet advertisement did not contain allegations of fact that could be the basis of a fraud claim, and it so instructed the jury. The court also held that the statement by High Mark's realtor could not be a statement of fact that could be the basis of a fraud claim. The Plaintiffs have not challenged those rulings on appeal. Therefore, there was no misrepresentation that induced the Trust to enter into the real estate contract.

Alleged false representations about the financial condition of the tenant made after the Trust had entered into the contract could not form the basis of a fraud claim because the contract did not provide that the Trust could terminate it if the Trust determined that the tenant was not financially sound. The buyer could only terminate the contract "[s]hould the information provided on the estoppel differ from the information provided by Seller," and there is no contention that it did. The Trust was already bound to purchase the property before the alleged false representations were made. "It is immaterial if one is induced by false representations to do what one is bound to do . . . ." 37 Am. Jur. 2d *Fraud and Deceit* § 283 (2001). However, the record does not reflect that the other Plaintiffs were contractually bound to invest in the property until they executed the Tenancy in Common Agreement dated November 15, 2007, which

4

required them to contribute to the purchase price. That agreement was executed after an alleged misrepresentation regarding the tenant's payment of rent. Therefore, the other Plaintiffs would have a cause of action for fraud based upon that alleged misrepresentation. However, for the sake of simplicity, when addressing the fraud claim we will refer to the Plaintiffs, even though the Trust does not have a claim of fraud based upon the making of a misrepresentation.

The district court instructed the jury that two of the elements the Plaintiffs had to prove by clear and convincing evidence in order to establish fraud were that "the defendant stated a fact to the plaintiff" and that "[t]he statement was false." The only alleged misrepresentations that the Plaintiffs argue on appeal were included in the Income and Expense Statement faxed to their realtor on August 27, 2007, and the Estoppel Certificate dated October 17, 2007. The Plaintiffs contend that these documents "falsely represented that the Center had been paying all of its monthly rent."

The Income and Expense Statement showed that from June 2006 through July 2007, the rent received from the Children's Center totaled $324,836.00. The Estoppel Certificate included a statement that "[a]ll minimum monthly rent has been paid to the end of the current calendar month, which is September 2007." The Plaintiffs contend that these statements were false because the Center's records show that it did not make rental payments during the six-month period from August 2006 through January 2007. From the evidence at trial, the jury could reasonably have concluded that there was no false statement regarding the Center's payment of rent.

In 2002, the Children's Center began its business of providing psychiatric, psychological, counseling, and therapy services to children and adolescents. It leased space in a building located at 1615 Curlew Drive, Ammon, which was owned by Arave Brothers, LLC, a company owned by Gordon Arave and his brother. Because the Center was a new business, Arave Brothers agreed that it did not have to pay any rent for the first six months of the lease. Arave Brothers later sold the building to a third party, subject to the Center's lease, and the Center continued occupying that building for the duration of the lease.

The Children's Center wanted to expand its business, and in 2004 it discussed with Gordon Arave a proposal to have a new building constructed in Pocatello. Gordon Arave agreed to do so, and Arave Construction, Inc., purchased a parcel of land near the hospital, built a building, and sold it to Crestwood Enterprises, LLC, a company in which Gordon Arave is a part

owner. The Center began leasing space in that building on May 1, 2005, and Crestwood Enterprises agreed that the Center would not have to pay rent for the first six months because it was expanding into a new market.

On June 1, 2005, Gordon Arave loaned M. Smith Enterprises, LLC, a company owned by the Center's CEO, the sum of $100,000, in exchange for a promissory note payable in monthly interest-only payments until June 1, 2010, when the balance was to be paid. On October 1, 2005, Mr. Arave made another $100,000 loan to Smith Enterprises on like terms in exchange for a promissory note with the balloon payment being due on October 1, 2010.

In 2005, the Children's Center was nearing the end of its five-year lease on the building in Ammon. It discussed with Gordon Arave about constructing a new building for it to lease. Arave Construction agreed to construct a building on adjoining property at 1675 Curlew Drive. When the building was completed, it sold the property to High Mark Development, LLC.

The Children's Center began leasing the building on June 19, 2006. After it had moved in, it contacted Mr. Arave in July or August 2006[1] and asked if it could have the same concession as the other two leases—six months of free rent. Mr. Arave and his accountant then met with the Center to discuss the request and to review some of its financial information. The accountant was impressed with the Center's business model and felt its business was growing. Mr. Arave stated that he would not agree to six months of free rent because High Mark did not have enough money on hand to do that. High Mark needed to make the mortgage payments on the property. The Center then asked if six-month's rent could be deferred and paid over a period of seven years. Within a few days, Gordon Arave and Jared Arave agreed to loan the Center money for six month's rent plus an additional $49,975.00 from a business they had together, which was apparently Arave Livestock. As Gordon Arave testified:

> And ultimately we did have some money in another company, meaning Jared and I. We opted to loan that money to Matt Smith or to The Children's Center, I guess is the appropriate answer, to The Children's Center so that they could meet their rental obligations. Same thing as borrowing from a bank, I guess, the Bank of Commerce. We made a loan to them to do that with.

---

[1] There is also evidence that the agreement was not made until early 2007, but the jury had the right to resolve conflicts in the evidence. The accountant testified he thought it was in July or August, and Mr. Arave testified that he thought it was August, but it may have been September or October of 2006. Even if it were September or October, the rent would have been paid with the loan proceeds prior to 2007.

It appears that the loan proceeds for the rent were remitted directly to Seller rather than to Tenant. When called as a witness by Plaintiffs, Gordon Arave testified:

> A. High Mark Development did not accept a promissory note. Gordon and Jared Arave accepted a promissory note after having made a loan to The Children's Center to make those payments; that's correct.
> Q. Well, the payments weren't made.
> A. Well, do you suppose that High Mark Development could make their payments without any money?
> Q. Well, I'm asking you—
> A. Someone had to give them that money.

The Children's Center was to prepare and sign the promissory note, but it did not provide the signed note until April 18, 2007. The note was made payable to Gordon Arave and Jared Arave, not to High Mark. If the note was simply to evidence the debt for the unpaid rent and to establish terms for the payment of that rent, it would have been made payable to High Mark because it was High Mark that was owed the rental payments. Thus, the jury could have found that the Center did not fail to pay six month's rent. It borrowed money from Gordon Arave and Jared Arave to pay that rent. That the money for the rent was not paid to the Center so it could pay High Mark does not mean that the transaction was not a loan. When one borrows money to pay a specific obligation, it is common for a lender to remit the loan proceeds directly to the creditor rather than to the borrower.

The Income and Expense Statement stated that "Rent Received from 6/2006 through 7/2007" was $324,836.00. It did not make any representation as to the source of the funds used to pay the rent. The Estoppel Certificate stated that "[t]he Lease . . . has not been . . . altered or amended in any respect (except as indicated in the following sentence) . . . ." and that "[a]ll minimum monthly rent has been paid to the end of the current calendar month, which is September 2007 . . . ." It also did not represent the source of the funds used to pay the rent, and Gordon and Jared Arave's agreement to loan the Children's Center the funds to pay the rent did not constitute an alteration or amendment of the lease. Thus, there was sufficient evidence from which reasonable jurors could have concluded that the statements in the Income and Expense Statement and the Estoppel Certificate were truthful.

The Defendants' attorney did not argue to the jury the significance of Gordon Arave's testimony regarding him and Jared Arave making a loan to the Children's Center so it could meet its rental obligations. However, a jury is not bound to consider only the arguments made by

7

counsel. The district court instructed the jury at the beginning of the trial, "Your duties are to determine the facts, to apply the law set forth in these instructions to those facts, and in this way decide the case." The jury is not limited by counsel's understanding of the case, of the evidence, or of the law. It can determine the facts for itself and then apply them to the law as stated in the court's jury instructions in order to reach its verdict.[2]

**2. Causation.** The Defendants' counsel did not argue that the statements concerning the payment of rent were accurate. However, he did argue that under the evidence presented a reasonable jury could have found that the alleged misrepresentations did not cause the Plaintiffs any damages, and the district court agreed. The court had instructed the jury that the Plaintiffs were required to prove by clear and convincing evidence that they "suffered damages proximately caused by reliance on the false statement." Based upon the evidence in the record, the jury could reasonably have found that the Plaintiffs failed to prove that their damages were caused by any representations in the Income and Expense Statement or the Estoppel Certificate, even if they were false.

The jury could reasonably have concluded that the Plaintiffs' actions showed that they would have purchased the property even had they known that the tenant did not pay rent from August 2006 through January 2007, assuming that it had not. After Mr. O'Shea learned that the property was for sale, he saw the internet advertisement and the website of the tenant. On August 7, 2007, Mr. O'Shea's realtor friend e-mailed High Mark's realtor stating that the trust would like to make an offer on the property. He stated in the email, "The family trust will be an all cash purchase and can close in 30 days."

On August 14, 2007, Mr. O'Shea signed the contract for the trust to purchase the property without ever having seen the property or having made an investigation into the financial condition of the tenant. There was no provision in the contract making the buyer's obligation to purchase contingent upon the buyer being satisfied with the financial condition of the tenant. During trial, Mr. O'Shea testified that he would have liked to ask the tenant some questions such as "how long he's been in business and how his operation was doing and how he saw the future

---

[2] When instructing the jury on the breach of contract claim, the district court informed them that it "previously found that the Lease Estoppel Certificate did not contain accurate information, that is, representations that the Lease had not been modified, supplemented, altered or amended, and representations that all minimum monthly rent had been paid, were not accurate." It did not include a similar instruction when instructing the jury on fraud.

8

of the operation," but he made no attempt to contact the tenant to obtain that information, even though he had the tenant's telephone number from the tenant's website.

The contract provided that High Mark was to provide "2005 and 2006 federal tax returns of tenant and a current balance sheet showing assets and liabilities." In late August 2007, the Plaintiffs' realtor was provided with copies of the Children's Center's 2005 and 2006 federal and state income tax returns and a profit and loss statement for the Center covering the period from January 1 through June 7, 2007. The realtor only forwarded to Mr. O'Shea copies of two pages of each year's tax returns. They were the page showing total income and the page showing expenses, which was probably the schedule of "Other Deductions." Those documents showed that in 2005, the Center had total income of $4,228,949 and total deductions (excluding depreciation) of $3,938,412, for a net gain of $290,537. It was then able to take a net operating loss carried forward from a prior year in the sum of $165,908. In 2006, the Center had total income of $5,817,303 and total deductions (excluding depreciation) of $6,183,462, for a net loss of $366,159. The profit and loss statement for the first six months of 2007 showed total income of $2,643,751.34, total expenses of $2,654,572.04, for a net loss of $10,820.70.

Mr. O'Shea testified that there was "some concerns" about the loss in 2006, but their realtor informed them that the Children's Center was expanding its business, it had moved into a new building, and it was hiring additional doctors and staff. They considered these very legitimate reasons for the high expenses in 2006. Mr. O'Shea also testified that he did not consider the loss in 2006 significant, but he put great significance upon the fact that during the first six months of 2007 the Center's loss had dropped to only about $10,000.

The Plaintiffs did not make any inquiry about the Children's Center's long-term debt, nor did they inquire as to its sources of income. They did not inquire as to how in 2006 it was able to pay out $366,159 more in expenses than it received in income.

Jack Chillemi, the manager of Grandview, LLC, testified that the Plaintiffs thought the Center had "got over the expense hump," and the Plaintiffs' realtor, who consulted with the Plaintiffs, stated that they saw that the Center had "righted the ship." Mr. O'Shea also testified that the income tax returns showed that the Center was a growing business because its gross income had grown by almost forty percent from 2005 to 2006.

The jury could have concluded from the evidence that the other Plaintiffs relied heavily upon Mr. O'Shea in deciding to invest in the property. The O'Sheas were experienced in buying

and selling commercial real estate. Kate Donahue and Mrs. O'Shea are sisters. Ms. Donahue's personal investment was to complete a Section 1031 exchange. She and her brother, John Kevin Donahue, were also officers of the San Francisco Residence Club, Inc. She testified that she relied upon Mr. O'Shea in making her investment decision. Mr. Donahue testified that he did not review many of the documents provided and was not involved in the transaction. Caleb Foote testified that Mr. and Mrs. O'Shea were very good friends of his, that he was not involved with a lot of the specifics, and that he trusted the O'Sheas implicitly, which was a huge factor in his decision to join the investment group. Jack Chillemi, the manager of Grandview Credit, testified that Mr. O'Shea was one of his closest friends, that he relied upon Mr. O'Shea to accumulate a lot of the information, and that it was a group decision to go ahead with the investment. Kate Donahue also testified that it was a group decision to go ahead with the investment. Mr. O'Shea did not provide the other Plaintiffs with all of the documents he obtained, but only gave them the documents he believed they needed.

The jury could reasonably have concluded that the O'Sheas had an incentive to use their influence to convince the other Plaintiffs to invest in the property so that this transaction could be completed. They had sold some commercial properties in 2007 and wanted to complete a Section 1031 exchange in order to avoid paying about $400,000 in income taxes. To do so, they were required to identify like-kind property to purchase within forty-five days and to complete the purchase within the following 180 days. Thomas O'Shea was looking for commercial property to purchase in Idaho, when his realtor friend informed him of the High Mark property that was for sale. The real estate contract stated that the buyer "intends to use the purchase and sale of the Premises as an integral part of a tax deferred like-kind exchange as allowed under Section 1031 of the Internal Revenue Code." The closing date was to be "no later than September 15, 2007."

The contract also provided that the purchase price would be paid in cash, and it was not contingent upon the buyer obtaining financing. The evidence indicates that the O'Sheas needed the investors in order to obtain the financing to complete the purchase. Without them, they would not have been able to do so.

The closing date was later extended several times. There were two main issues raised by the Plaintiffs regarding the estoppel certificates. There were several versions of the certificates

before the one dated October 17, 2007, and Gordon Arave did not see any of them, including the final one. They were drafted by the Plaintiffs' lawyer and by High Mark's lawyer.

Mr. O'Shea was concerned that the lease was ambiguous as to the property management expenses to be borne by the Children's Center. Mr. O'Shea demanded that the estoppel certificate specifically include certain expenses that the Center was to pay, and the Center objected that doing so was modifying the lease. The Plaintiffs, through their realtor, also expressed concern over the Center's option to purchase the property contained in the lease. The purchase price was to be determined by an appraisal, and the Plaintiffs were concerned that if the Center exercised the option, the Plaintiffs could be required to sell the property for less than they had paid for it. In an addendum to the real estate contract, High Mark and Gordon Arave agreed to indemnify the Plaintiffs from any loss if the Center attempted to exercise its option. On September 19, 2007, Mr. O'Shea accepted the terms of that indemnification, but by letter dated October 12, 2007, the Plaintiffs' realtor informed High Mark's realtor: "[O]ne of the parties that agreed to partner with Tom O'Shea pulled out. The reason stated was that they could not reconcile the issue with the Tenant's option to purchase the building." During the trial, the realtor conceded the statement was false and stated that he was just trying to get the process moving. However, High Mark did not know it was a false statement. The realtor also informed High Mark's realtor that Mr. O'Shea was still attempting to arrange financing, and that one financing option may require Gordon Arave to loan Mr. O'Shea $300,000 on a short-term note. The letter added that "this is a 1031 Exchange for Tom and the clock is ticking."

On October 18, 2007, the Children's Center and High Mark agreed to resolve these issues. The Center also had an option to purchase the Pocatello property that it was leasing. The expansion into Pocatello had not been successful and it was centralizing its business in the Ammon facility. High Mark wanted the Center to relinquish both options to purchase. The Center agreed that it would release both options, that it would sign the estoppel certificate that included the language required by Mr. O'Shea concerning the payment of specified expenses, and that it would sign a new promissory note to change the payment schedule of the October 1, 2005, promissory note. In exchange, Gordon Arave and Jared Arave agreed to release the Center from its obligation to pay the promissory note dated April 18, 2007, in the sum of $199,900.00.

The relevance of the nonpayment of rent was what it indicated about the Center's financial condition. A reasonable jury could have concluded that had the Plaintiffs been told that

the Center was unable to pay rent from August 2006 through January 2007, they would still have purchased the property. The Plaintiffs were not concerned about the Center's inability to pay over $366,000 of its operating expenses in 2006 because it appeared that the Center was now doing well financially. Their concern was not whether the Center had paid its debts in the past, but whether it appeared it could pay them in the future, and they concluded that it did. Because its financial difficulties were sufficiently explained, it now appeared that the Center would be earning a profit. The jury could reasonably conclude that Plaintiffs failed to prove by clear and convincing evidence that they would not have purchased the property had they known of the nonpayment of the rent (assuming it occurred).

The jury could also have found that the Children's Center's ultimate failure was not due to any financial condition that existed when Mr. O'Shea signed the contract. The Center ceased operations in August or September 2008, about a year after Mr. O'Shea signed the contract. The cause was twofold: a decision made by the Idaho Board of Medicine that the Center could not employ physicians and a reduction in Medicaid funding.

The Center had employed psychiatrists and a pediatric neurologist, and a significant portion of its profit was the amount by which the Medicaid reimbursement received for their services exceeded what it had to pay those physicians. Eventually, the Idaho Board of Medicine investigated and informed the Center that it could not employ physicians. Only hospitals or managed care facilities could do so. The physicians would have to be independent contractors, which meant that they would bill Medicaid and receive the Medicaid monies, not the Center. The person who was the Center's attorney when this occurred testified that it was "a big precipitating factor" in the Center going out of business.

The other factor was a reduction in Medicaid funding that began sometime in 2007. Medicaid began reducing the number of hours it would pay for services provided by the psychological rehabilitation workers, and it also reduced payments for intensive behavioral intervention (IBI). The Medicaid reimbursement was eventually reduced to the point that the Center had to close its IBI Department and lay off the IBI workers. A large number of the parents whose children were seen at the Center could not pay for the treatment themselves, and they did not have private health insurance that would pay. The Medicaid cutbacks significantly reduced the Center's revenues.

Thus, assuming that the jury found that High Mark had misrepresented the lease payments made by the Children's Center, it could reasonably have concluded that such misrepresentations did not cause the Plaintiffs' damages. Even had they known of the missed payments, they would have still purchased the property because it appeared to them that the Center had overcome its financial difficulties. Ultimately, the Center's closing was caused by two unanticipated events: the decision by the Idaho Board of Medicine that it could not employ physicians and a cutback in Medicaid reimbursements.

In summary, the jury could reasonably have found that there was no misrepresentation or that the Plaintiffs failed to prove that they had been damaged by the misrepresentations. Therefore, the district court did not err in denying the motion for a judgment notwithstanding the verdict on the fraud claim.

The dissent contends that the Plaintiffs raised the issue of fraud by failing to disclose that the Children's Center did not pay its rent in October, November, and December 2007. In doing so, the dissent fails to disclose certain material facts. First, it quotes from pages 22-23 of the Plaintiffs' opening brief. That argument was in support of the Plaintiffs assertion, "Even if Appellants had conducted their own investigation, the Court erred because it did not determine whether the records, had they been reviewed, actually disclosed the inaccuracy of the representations." (Appellants' Opening Brief, p. 20.) The first sentence of the quoted argument states, "None of these documents 'disclose[d] the inaccuracy of the representation[s]' that the Center had regularly paid its rent and was current." The documents to which the Plaintiffs referred were "a copy of the Center's current balance sheet [dated August 28, 2007] showing an outstanding loan obligation of Gordon Arave, as well as other liabilities" and "the Center's 2005 and 2006 tax returns and a 2007 profit and loss statement, showing 'financial trouble.' " (Appellants' Opening Brief, p. 22.) Those documents were all sent to the Plaintiffs in August 2007,[3] and they did not purport to represent whether the Center had paid rent in October, November, or December 2007. The argument being made was that the documents did not disclose the Center's alleged nonpayment of rent during the period from August 2006 through January 2007. During this portion of the argument, there was no mention of the failure to disclose nonpayment of rent in October, November, or December 2007.

---

[3] The Plaintiffs deny receiving the August 28, 2007, balance sheet.

13

The dissent then refers to pages 28 and 33 of the Plaintiffs' opening brief. In that portion of the Plaintiffs' brief, they were arguing, "The District Court erred as a matter of law by denying the Appellants' Motion for Partial Summary Judgment." (Appellants' Opening Brief, p. 28.) After first arguing that this Court should overrule its prior decisions and review on appeal the denial of a motion for summary judgment, the Plaintiffs stated that the district court erred in denying the Plaintiffs' motion for partial summary judgment because "[a]t summary judgment, the District Court erred in its analysis of fraud by nondisclosure by failing to look at every circumstance under which a duty to disclose exists." (Appellants' Opening Brief, p. 33.) In this portion of its argument as to why the district court erred in failing to grant partial summary judgment, the Plaintiffs stated that the duty to disclose included "the November 7, 2007 promissory note, signed after the Estoppel Certificate had been provided to Appellants." (Appellants' Opening Brief, p. 34.) The Center gave the November 7, 2007, promissory note for the October and November 2007 rent. This reference was to support the Plaintiffs' assertion that the district court erred in not granting their motion for partial summary judgment, not that it erred in failing to grant a judgment notwithstanding the verdict or a new trial. This is the only portion of their brief in which the Plaintiffs argue any error based upon the November 7, 2007, promissory note or the nonpayment of rent in October, November, or December 2007.

Even if we considered that the argument in this portion of the brief regarding the district court's denial of their motion for summary judgment should be considered as an argument in support of their motion for a judgment notwithstanding the verdict or a new trial, their argument would still fail. Their argument was: "This 'subsequent information' made High Mark's previous representation 'untrue or misleading.' High Mark also had a duty to disclose that 'all minimum monthly rent' had in fact not been paid, in order 'to prevent a partial or ambiguous statement of fact from becoming misleading.' " (Appellants' Opening Brief, p. 34.) The previous representation to which Plaintiffs referred was the Estoppel Certificate dated October 17, 2007, in which the Children's Center stated, "All minimum monthly rent has been paid to the end of the current calendar month, which is September 2007." The Center's nonpayment of rent in October, November, or December 2007, was not subsequent information showing false or misleading the Center's statement that all monthly rent had been paid through September 2007. Thus, even if we restructured the Plaintiffs' brief to change their argument in support of the alleged error in denying their motion for partial summary judgment so that it was in support of

14

the alleged error in denying their motion for a judgment notwithstanding the verdict or a new trial, the argument would fail. The Estoppel Certificate did not purport to represent the future conduct of the Center.

Finally, the dissent states that "on pages 35-37 of their opening brief, Plaintiffs engage in a discussion of fraud by nondisclosure, the duty to disclose, and why they believe the instruction given by the district court on this issue was inadequate under the circumstances of their case." In this portion of the Plaintiffs' brief, they were asserting that Instruction No. 34 given by the district court was inadequate. The Plaintiffs' quoted the jury instruction given by the district court, referred to an earlier quotation from *Watts v. Krebs*,[4] and then stated that "the Instruction did not completely discuss every situation in which a duty to disclose exists, as set forth in *Watts v. Krebs*, 131 Idaho 616, 962 P.2d 387 (1998) and *Sowards v. Rathbun*, 134 Idaho 702, 8 P.3d 1245 (2000)," without identifying any of those situations. More importantly, the Plaintiffs did not mention any of the facts in this case, nor do they even mention a single fact that any the Defendants allegedly failed to disclose. Simply quoting general statements of the law and hoping the Court will search the record for facts that may be applicable to those general statements could hardly be considered an argument as to why the facts were insufficient to support the jury verdict.

The dissent does not apply the correct standard of review. The issue is whether there is substantial and competent evidence to support the jury's verdict. *Pines Grazing Ass'n, Inc. v. Flying Joseph Ranch*, LLC, 151 Idaho 924, ____, 265 P.3d 1136, 1143 (2011). It is not whether

---

[4] The Plaintiffs stated, "The Instruction is inconsistent with the simple elements of fraud by nondisclosure as stated in *Watts v. Krebs*, and quoted above." The preceding quotation from *Watts* occurred in the Plaintiffs' argument that the district court erred in failing to grant the Plaintiffs' motion for summary judgment, wherein they quoted from *Watts v. Krebs*, 131 Idaho 616, 620, 962 P.2d 387, 391 (1998), as follows:

> "A duty to speak arises in situations where the parties do not deal on equal terms or where information to be conveyed is not already in possession of the other party." The Court of Appeals has summarized the elements:
>> A duty to disclose may arise when (a) a party to a business transaction is in a fiduciary relationship [or other similar relationship of trust and confidence] with the other party; or (b) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or (c) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or (d) a party knows a false representation is about to be relied upon; or (e) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of the relationship between them or the customs of trade or other objective circumstances would reasonably expect a disclosure of the facts.

15

there was substantial and competent evidence for the jury to return a different verdict, or what verdict the dissent would have reached as the trier of fact. The evidence must be construed in a light most favorable to the party who prevailed at the trial, not the losing party. *Id*.

**B.**

**Breach of Contract Claim.**

The district court granted partial summary judgment on the breach of contract claim, based upon the implied covenant of good faith and fair dealing. The contract provided: "Estoppels: Seller shall deliver to Buyer and [sic] estoppel for the Tenant 10 days prior to Closing. Should the information provided on the estoppel differ from the information provided by Seller, Buyer shall have the option to terminate the Agreement and receive full refund of Earnest Money." The court found, based upon the evidence presented in connection with the summary judgment proceedings, that "representations in the Certificate to the effect that there had been no modifications to the Lease and that all rent had been paid were inaccurate," which constituted a breach of the implied covenant of good faith and fair dealing. However, it held that the jury must decide whether such breach was a proximate cause of any damages.

The court's finding of breach of contract was not based upon the same evidence presented at trial. In defense to the Plaintiffs' motion for summary judgment, the Defendants' counsel did not present to the district court the evidence set forth above regarding the loan from Gordon and Jared Arave to the Children's Center for the rental payments. The Defendants' counsel also did not argue the doctrine of merger as a bar to a breach of contract claim. *See Estes v. Barry*, 132 Idaho 82, 967 P.2d 284 (1998). There is also no indication in the record that the O'Sheas assigned any breach of contract claim to the other Plaintiffs.

With respect to the breach of contract claim, the district court instructed the jury as follows:

> Plaintiffs have alleged breach of contract against Defendant High Mark Development, LLC. The Court has previously found that the Commercial/Investment Real Estate Purchase and Sale Agreement was a contract between Defendant High Mark Development, LLC and Plaintiff O'Shea Family Trust. The Court also previously found that the Lease Estoppel Certificate did not contain accurate information, that is, representations that the Lease had not been modified, supplemented, altered or amended, and representations that all minimum monthly rent had been paid, were not accurate and were therefore a

16

breach of the implied covenant of good faith and fair dealing and breach of contract.

It also instructed the jury that the Plaintiffs have the burden of proving that they "have been damaged on account of the breach" and "[t]he amount of the damages."

The district court held that the jury could reasonably have determined that the Plaintiffs failed to prove that they were damaged by the breach. For the same reasons set forth above regarding the fraud claim, the jury could also reasonably have found that the Plaintiffs failed to prove that the breach of contract caused any damages. In addition, the jury could have found that the breach did not cause any damages because the Plaintiffs did not have the right to terminate the contract for the misrepresentation in the estoppel certificate. They could only terminate the contract "[s]hould the information provided on the estoppel differ from the information provided by Seller," and it did not. Therefore, the district court did not err in denying the motion for a judgment notwithstanding the verdict on the breach of contract claim.

### III.

### Did the District Court Err in Denying Buyer's Motion for a New Trial?

The Plaintiffs moved for a new trial on both the breach of contract claim and the fraud claims on the ground of insufficiency of the evidence to justify the verdict. I.R.C.P. 59(a)(7). The district court denied the motion.

After making an assessment of the credibility of the witnesses and weighing the evidence, a trial court may grant a new trial on the ground of insufficiency of the evidence if the judge determines that the verdict is not in accord with the clear weight of the evidence and that a different result would follow a retrial. *Hudelson v. Delta Int'l Mach. Corp*., 142 Idaho 244, 248, 127 P.3d 147, 151 (2005).

The standard we apply when reviewing a trial court's decision on a motion for a new trial is as follows:

> When reviewing a trial judge's grant of a new trial on appeal, this Court applies the abuse of discretion standard. A trial judge has wide discretion to grant or deny a request for a new trial, and we will not overturn the judge's decision absent a showing of a manifest abuse of discretion. Although we will review the evidence, we primarily focus upon the process used by the trial judge in reaching his or her decision, not upon the result of that decision. The trial judge is in a far better position than we to weigh the demeanor, credibility and testimony of

17

witnesses and the persuasiveness of all the evidence. Therefore, we do not weigh the evidence. Our inquiry is: (1) whether the trial judge correctly perceived the issue as one of discretion; (2) whether the trial judge acted within the outer boundaries of his or her discretion and consistently with the legal standards applicable to the specific available choices; and (3) whether the trial judge reached his or her decision by an exercise of reason.

*Id.* (citations omitted).

The Plaintiffs contend that "the District Court did not actually weigh the evidence and determine whether the verdict was against the Court's view of the clear weight of the evidence, and whether a new trial would produce a different result." The district court commenced its analysis by quoting the applicable standard of review from *Karlson v. Harris*, 140 Idaho 561, 97 P.3d 428 (2004). That quotation included the statement that " '[i]f . . . the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.' " *Id.* at 568, 97 P.3d at 435 (quoting from *Quick v. Crane*, 111 Idaho 759, 768, 727 P.2d 1187, 1196 (1986)). The Court first addressed the breach of contract claim. After discussing the evidence, the court stated that the jury could reasonably have concluded that the statements made in the Estoppel Certificate were not the proximate cause of any damages. It wrote, "The jury could likewise have concluded that, by ignoring other disclosures showing financial difficulty, Plaintiffs were going to proceed with the purchase regardless of the information provided in the Estoppel in order to realize the tax benefits from a § 1031 like-kind exchange." The court concluded its analysis by stating, "While the Court may not necessarily agree with the jury verdict, the Court does not have a 'definite and firm conviction' that a mistake has been made." This statement was the equivalent to stating that the verdict was not against the clear weight of the evidence, and was so used in *Quick v. Crane*, 111 Idaho 759, 768, 727 P.2d 1187, 1196 (1986). The court then addressed the fraud claims and concluded that there was substantial evidence supporting the jury's decision that the false statements did not cause injury. It is obvious that the court's analysis of causation under the breach of contract claim would also apply to the fraud claim. Having determined that the verdict was not against the clear weight of the evidence, it was not necessary to also determine whether a different result would follow a retrial. The Plaintiffs have not shown that the district court manifestly abused its discretion by denying their motion for a new trial.

18

## IV.

## Did the District Court Err in Instructing the Jury on

## the Issue of Fraud by Nondisclosure?

In their amended complaint, the Plaintiffs alleged a claim of fraud by failing to disclose a material fact. Prior to trial, they submitted a jury instruction on the duty to speak, which stated as follows:

> Fraud may also be established by silence where the Defendants or any one of them had a duty to speak. A duty to speak arises in situations where the parties do not deal on equal terms or where information to be conveyed is not already in possession of the other party. A duty to speak may also arise in any one of the following instances:
> (a) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or
> (b) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or
> (c) a party knows a false representation is about to be relied upon; or
> (d) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of the relationship between them or the customs of the trade or other objective circumstances would reasonably expect a disclosure of the facts.

The trial court did not give that instruction on the ground that it was covered by its other jury instruction. The court's instruction on fraud by nondisclosure began with the following statement: "Silence may constitute fraud when a duty to disclose exists. A party is under a duty to disclose if a fact known by one party and not the other is a vital fact upon which the bargain is based." The court also instructed the jury that nondisclosure of the vital fact had to be material, which the court defined as follows:

> "Materiality" refers to the importance of the alleged disclosure or nondisclosure in determining the party's course of action. A disclosure or nondisclosure is material if (a) a reasonable person would attach importance to its existence or nonexistence in determining a choice of action in the transaction in question, or (b) the person making the disclosure or failing to disclose knows or has reason to know that the recipient is likely to regard the matter as important in determining the choice of action, whether or not a reasonable person would so consider.

The Plaintiffs objected on the ground that the Court should list the instances in which a duty to disclose arises. He described them as follows:

And that would include duties where information to be conveyed is not already in possession of the other party, disclosure is necessary to prevent a partial or ambiguous statement from becoming misleading, subsequent information has been acquired which will make previous representation untrue or misleading, and a fact known by one party and not the other is so vital that if the mistake were mutual, contract—the contract would be avoidable—would be voidable and the party knowing that fact also knows that the other does not know it.

On appeal, the Plaintiffs contend that the instruction was erroneous because it does not completely discuss every situation in which a duty to disclose exists, as set forth in *Watts v. Krebs*, 131 Idaho 616, 962 P.2d 387 (1998) and *Sowards v. Rathbun*, 134 Idaho 702, 8 P.3d 1245 (2000). Other than making this statement, the Plaintiffs do not present any argument as to why the instruction given would not adequately cover the subject. Therefore, we will not consider the alleged error. *Inama v. Boise County ex rel. Bd. of Comm'rs*, 138 Idaho 324, 330, 63 P.3d 450, 456 (2003) ("We will not consider issues cited on appeal that are not supported by argument and propositions of law").

The Appellants also contend that the court's instruction was "overbroad, complicated, and confusing" and that "the instruction required the jury to find that a fact was 'vital,' that the bargain was 'based' upon that fact, and also that the nondisclosure was 'material.'" Rule 51(b) of the Idaho Rules of Civil Procedure states, "No party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which that party objects and the grounds of the objection." We need not consider these objections to the jury instruction because the Plaintiffs did not object on these grounds before the district court.

# V.

## Did the District Court Err in Denying the Plaintiffs' Motion
## for Partial Summary Judgment Establishing Liability?

The Plaintiffs ask us to reverse the district court's denial of their motion for partial summary judgment. "An order denying a motion for summary judgment is not reviewable on appeal from a final judgment." *Watson v. Idaho Falls Consol. Hosps., Inc.*, 111 Idaho 44, 46, 720 P.2d 632, 634 (1986).

# VI.

## Is Either Party Entitled to an Award of Attorney Fees on Appeal?

The Plaintiffs seek an award of attorney fees on appeal pursuant to Idaho Code section 12-120(3) and the real estate contract. They both require that the party be the prevailing party in order to be awarded attorney fees. Because the Plaintiffs have not prevailed on appeal, they are not entitled to an award of attorney fees.

The Defendants also seek an award of attorney fees on appeal pursuant to the contract and to Idaho Code section 12-120(3). We need only address the statutory basis for an award of attorney fees. It grants the prevailing party the right to recover attorney fees in any action to recover in a commercial transaction. It defines a commercial transaction as "all transactions except transactions for personal or household purposes." I.C. § 12-120(3). The district court awarded High Mark attorney fees under this statute on the ground that the real estate contract was a commercial transaction, and the Plaintiffs have not challenged that determination on appeal.

In their amended complaint, the Plaintiffs alleged that all of the Defendants participated in the transaction and were liable for fraud. On appeal, they ask us to set aside the verdicts in favor of the Defendants who participated in the trial and to direct the district court to enter judgments against them on liability. The prevailing party is entitled to an award of attorney fees under this statute "where the action is one to recover in a commercial transaction, regardless of the proof that the commercial transaction alleged did, in fact, occur." *Garner v. Povey*, 151 Idaho 462, ___, 259 P.3d 608, 615 (2011)(Citations omitted). Therefore, the Defendants are entitled to an award of attorney fees on appeal pursuant to Idaho Code section 12-120(3).

# VII.

## Conclusion.

We affirm the judgment of the district court. We award respondents costs on appeal, including attorney fees.


Chief Justice BURDICK and Justice HORTON **CONCUR.**

J. JONES, Justice, concurring in part and dissenting in part.

I dissent from Part II.A of the Court's opinion, particularly from the conclusion that the Plaintiffs did not effectively raise the nondisclosure aspect of their fraud claim on appeal. Not only did the Plaintiffs effectively raise the issue on appeal, they established a right to relief on that ground. I dissent with respect to Part II.B and Part III. Although I dissent from the Court's conclusion that the Plaintiffs did not raise the issue of nondisclosure in their appeal and believe the given jury instruction on the issue was inadequate, I concur with the result reached by the Court in Part IV, regarding the Plaintiffs' claim of error with respect to the jury instruction on the nondisclosure issue. I concur in Part V of the opinion. I dissent from the Court's holding in Part VI that Defendants are entitled to an attorney fee award.

With regard to the issue of whether the Plaintiffs adequately addressed their nondisclosure claim, it certainly appears from their opening brief that the Plaintiffs were raising a fuss that the Defendants failed to disclose a very material fact—that the Children's Center had not been making rental payments required under the lease—a transgression that went to the very heart of the transaction. While it can be said that the Plaintiffs intermixed their misrepresentation and nondisclosure claims, it cannot be said that the nondisclosure issue was not addressed in their opening brief. The brief intermingled the two varieties of misrepresentation, outlining first the false statements allegedly made to them and then highlighting the material facts that should have been disclosed to them but which were deliberately withheld.[5] It might have been more effective, both below and on appeal, to treat the two issues separately, but the Plaintiffs were not obligated to do so.

Fraud is fraud, and this Court has not previously drawn a clear distinction between fraud involving nondisclosure of a material fact and fraud involving an affirmative misrepresentation. The two are often interrelated. In *G&M Farms v. Funk Irr. Co.*, 119 Idaho 514, 808 P.2d 851 (1991) the plaintiff/appellant alleged intentional misrepresentation in its complaint. *Id.* at 518,

---

[5] Plaintiffs' argument on appeal essentially mirrored their argument to the jury in this regard. In their closing argument the Plaintiffs first told the jury of false statements that were made to them and then immediately turned to matters of nondisclosure. Their counsel argued:

> Now I want to talk about the nondisclosure part of this because, you'll recall, the Court has instructed us that one of the claims we seek is fraud by silence, by nondisclosure, not only what did you tell us that was untrue that we relied on and had a right to rely on but what was material, what was material to the transaction, that wasn't disclosed.

22

808 P.2d at 855. The district court granted summary judgment to the defendant/respondent, determining that the alleged misrepresentations did not support a fraud claim. *Id.* This Court reversed the summary judgment because the district court had failed to consider nondisclosure of a material fact as an intentional misrepresentation. *Id.* at 526, 808 P.2d at 863. We said:

> In *Tusch Enters. v. Coffin*, 113 Idaho 37, 41, 740 P.2d 1022, 1026 (1987), this Court held that an intentional misrepresentation or fraud claim should not be analyzed only with reference to the [nine] elements recited in *Faw v. Greenwood*, 101 Idaho 387, [389,] 613 P.2d 1338 [,1340] (1980). We stated in *Tusch* that the facts of that case fell within the category of misrepresentation on the basis of nondisclosure. 113 Idaho at 41−42, 740 P.2d at 1026−27.

*Id.* at 520, 808 P.2d at 857.

The plaintiff in *Watts v. Krebs*, 131 Idaho 616, 962 P.2d 387 (1998) alleged that she was fraudulently induced to enter into an agreement to partition real property based on the defendant's failure to disclose that he had removed the timber from the property. *Id.* at 619, 962 P.2d at 390. The defendant claimed "that he had to make some affirmative allegation before [the plaintiff] had a right to rely on his nondisclosure and, because he made no such allegation, [the [plaintiff] had no right to rely on his failure to disclose the fact of harvesting." *Id.* at 620, 962 P.2d at 391. Nevertheless, we stated, "this case did not involve an allegation of fraud by nondisclosure; it involves a claim for intentional misrepresentation." *Id.* The Court went on to note the holding in *G&M Farms* that fraud "may be established by silence where the defendant had a duty to speak" and that a duty to speak arises in situations "where information to be conveyed is not already in possession of the other party." *Id.* The interrelationship between the two varieties of fraud is rather apparent.

The *Watts* Court then approvingly cited to *St. Alphonsus Reg'l Med. Ctr., Inc. v. Krueger*, 124 Idaho 501, 508, 861 P.2d 71, 78 (Ct. App. 1992) to outline several instances where a duty to disclose may arise, including several pertinent to this case:

> (b) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or (c) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or (d) a party knows a false representation is about to be relied upon; or (e) a party

knows the opposing party is about to enter into the transaction under a mistake of fact and because of . . . objective circumstances would reasonably expect a disclosure of the facts.

131 Idaho at 620, 962 P.2d at 391.

Although this is primarily a nondisclosure case, it also involves misrepresentations.[6] The principal misrepresentation made by High Mark—the assertion contained in the lease estoppel certificate (Estoppel Certificate) that all rent had been paid and was current—placed a heightened duty on High Mark to disclose what it never did disclose—that the Children's Center had failed to make numerous rent payments. The Defendants not only withheld this critical information, they appear to have made every effort to conceal it.

Thomas O'Shea became interested in purchasing the property based upon the real estate listing, which stated, "[h]ere is a great investment property with that hard to find 10 year, Triple Net Lease." The listing stated that the "Scheduled Gross Income" and "Net Operating Income" was $299,850, annually, or $24,987.50, monthly.[7] It is obvious the property was being marketed as an income-producing property. The most reliable method for valuing such a property is the income approach "because that type of property is sold and purchased based upon actual income." *The Senator, Inc. v. Ada Co., Bd. of Equalization,* 138 Idaho 566, 573, 67 P.3d 45, 52 (2003). A reliable stream of income is necessary in order to support the value of a property under the income approach appraisal method. Thus, the existence of the lease was the heart of the $3,700,000 purchase price. Without the income stream, the value of the property would take a nosedive.

---

[6] In their amended complaint, the Plaintiffs allege about an equal mix of false statements and material nondisclosures in the third count, titled "Negligent and/or fraudulent misrepresentation." They focus on the representation that the Children's Center lease was in good standing and the failure of Defendants to inform them that many rental payments had not, indeed, been made or had been made by way of promissory notes, the purpose of which was not disclosed.

[7] In ruling on the Plaintiffs' motion for summary judgment, the district court said that language in the listing could not be used to support a claim for fraud because the language was "sales talk or puffing." The district court was incorrect in that regard, but the ruling has no real bearing on the nondisclosure claim. *See G&M Farms*, 119 Idaho at 522, 808 P.2d at 859 (The general rule that seller's talk or puffing do not amount to actionable misrepresentation "is not applicable where the parties to the transaction do not . . . have equal means of knowing the truth"). The relevance of the listing is that it helps to set the predicate for the nondisclosure claim—the fact that the property was being sold upon the strength of the lease, a fact that was fairly obvious throughout the transaction.

24

During discussions about the property, High Mark's broker, Paul Fife, was advised by Gordon Arave that the Children's Center "had always paid rent on time and he hadn't had any real problems" with the Center. Fife passed that information on to Jeff Needs, O'Shea's broker.[8] At no time during the course of the transaction did High Mark or any of its principals, agents or representatives advise any of the Plaintiffs that rent was not being paid or that the Children's Center had given two promissory notes in lieu of rent. The impression that rent was being paid and was current was reinforced by a fax from High Mark's broker to O'Shea's broker containing information of "Rent Received from 6/2006 through 7/2007…$324,836.00" and by the Estoppel Certificate, which unequivocally stated that the $24,987.50 monthly rent was current, as well as any taxes, utilities or any other charges required under the lease, and that no default or any condition that could result in default currently existed. High Mark attempts to sidestep responsibility for these false representations, asserting in its brief that it did not contribute to the drafting of the several versions of the Estoppel Certificate "as they related to the payment of rents."[9] What High Mark overlooks is that it was not the tenant's obligation under the real estate contract to furnish the certificate. Rather, it was specifically agreed that High Mark would furnish the certificate and High Mark had an absolute obligation to ensure that the representations were correct. High Mark knew at the time the certificate was furnished that much of the rent had not been paid, that this information was very material to the transaction, and that this information was not disclosed to the Plaintiffs.[10]

---

[8] In its ruling on Plaintiffs' motion for summary judgment, the district court indicated that when the information was passed from High Mark's broker to O'Shea's broker, it may have been qualified by the statement that "as far as he knew" the rent was being paid. Again, this is not particularly relevant to the nondisclosure claim. A number of documents purported to show that rent was being or had been paid.

[9] Defendants' counsel fails to note that, although he did not draft the initial version of the Estoppel Certificate, he did draft a subsequent version of the certificate, which did contain all of the representations regarding the payment of rents. Counsel disingenuously told the jury, "We weren't responsible for misrepresentations in the estoppel certificate," and "The tenant was the real party here who misrepresented facts, not my clients." This, despite the fact that the district court, in its summary judgment ruling, stated, "To the extent a contact requires one party to provide information to the other party in anticipation of completing the agreement, it is at least implicit in the agreement that the information will be accurate and reliable," referring to the rental and default representations in the Estoppel Certificate.

[10] The Estoppel Certificate is dated October 17, 2007. At that time the October rental payment was due and had not been paid. On November 7, 2007, Defendants' counsel drafted another promissory note, this one in the principal amount of $57,975, representing rental due for October and November of 2007. This was apparently for the purpose of deferring rent until the transaction was closed in December 2007. This note was never disclosed to the Plaintiffs. At trial, when asked if the November promissory note should have been disclosed, Gordon Arave testified, "When I looked back at that situation, that is perhaps correct. At that time it was not preeminent in my mind at all."

A promissory note, dated April 18, 2007, payable by the Children's Center to Gordon and Jared Arave, was unquestionably given in lieu of payment of $149,925 in rent that was owing for six months (August 2006−January 2007). Had the note been made payable directly to High Mark, this fact might have been more apparent. The note may have been written to the Araves to disguise the fact that rent was not being paid. The timing of the note is also of interest. The note represented six months of delinquent rent, going back as far as August 2006. Apparently, it did not occur to anyone to prepare a note until three months after the January payment became delinquent and just before the property was put on the market. A month and a half after the date of the note, the real property was listed for sale. After the real estate contract was signed, the Araves, with the concurrence of High Mark, agreed to cancel the note, on the condition that the Children's Center sign the Estoppel Certificate, which unequivocally stated that all rent had been paid. High Mark and the Children's Center entered into an agreement on October 18, 2007, to cancel the note in consideration for Children's Center's agreement to "immediately sign the estoppel certificate." The agreement was made specifically contingent upon the closing of the sale to the Plaintiffs. Rather than being told that the note was canceled as an inducement for the Children's Center to sign the false certificate, Defendants represented to the Plaintiffs that the cancellation of the note was in consideration of the Children's Center dropping its option to purchase the property. The Defendants well knew that the option to purchase was essentially worthless because they knew the Children's Center was in precarious financial condition and had questionable prospects for improving that condition. Again, Defendants absolutely failed to disclose to Plaintiffs that the Children's Center had not made those rent payments. When asked at trial whether he had ever told the O'Sheas about the existence of the April 18 note, Gordon Arave replied, "Never crossed my mind not one single time. Never thought about it."

After the Estoppel Certificate was signed on October 18, 2007, the Children's Center defaulted in payment of rent for October and November. Three days prior to that, the Children's Center's lawyer advised Scott Williams, a High Mark representative, that "We [Children's Center] are unable to pay High Mark today, and we will advise when those monies may be available." In the same time frame, the attorney and a Children's Center representative met with Williams and both "indicated to him that The Children's Center was having some severe financial difficulties and that we were not going to be able to make the [rent] payment and that we actually had a consultation with a bankruptcy attorney previously a couple of times and that it

26

was very likely that the company would be headed towards bankruptcy." On November 7, High Mark's counsel emailed the Children's Center's counsel to inquire about rent payment and to suggest that the two defaulted months be paid by virtue of a promissory note made payable to High Mark. The rent deferral note, dated November 7, 2007, was thereupon signed by the Children's Center. None of this was ever disclosed to the Plaintiffs.

The district court and the parties seem to have gotten overly concerned about the Estoppel Certificate and whether or not it was the principal source of information upon which the Plaintiffs relied to conclude the purchase. In its attempt to downplay the significance of the certificate, the Defendants, perhaps inadvertently, highlighted in their brief what was really important. They stated:

> [Jeff] Needs [Plaintiffs' realtor] testified during cross examination he "relied *mostly* on the lease" and "on the fact that the tenant *we had been told* was a strong tenant, had been paying every monthly rent on time, in a timely manner, had been a great tenant," in purchasing the property. Needs did not include the estoppel certificate in this list of what he, and by imputation, the buyers relied on for purchasing the property.[11]

(Emphasis in original.) The value of the property was clearly dependent upon the existence of the ten-year, $24,987.50-per-month lease. The Plaintiffs were relying on that strength in acquiring

---

[11] High Mark's counsel made a similar statement to the jury in attempting to absolve Gordon and Scott Arave from liability, saying:

> Let's turn to the question of what the buyers actually relied on in this case. And I think the best testimony was from Jeff Needs [O'Shea's realtor] as to what was relied on. Remember the questions that I asked Mr. Needs? I asked him "What was it that you mostly relied on in this case—rely on in this case?" And he testified that it was the lease agreement. And then he said, well, it also included statements that were made to him and to Tom O'Shea by Paul Fife [High Mark's broker].

Counsel's assertion that the Plaintiffs did not rely on the Estoppel Certificate is not supported by the record or by the fact that Needs did not specifically reference it in his testimony. The certificate itself stated, "This certification is made with the knowledge that it will be relied upon by Purchaser, Purchaser's lender and any successor or assignee of Purchaser's right to purchase the Property. . . ." The Estoppel Certificate was important in another regard because Addendum 1 to the real estate contract provided, "Should the information provided on the estoppel differ from the information provided by Seller, Buyer shall have the option to terminate the Agreement and receive full refund of Earnest Money." In other words, the Plaintiffs had an out, in the event that information in the certificate was false. Unfortunately, the Defendants did not provide the buyer the critical information that would have disclosed the falsity of the representations regarding rental and allowed the buyer to terminate the transaction.

the property. The Estoppel Certificate played a supporting role in reinforcing their belief that the property was worth what it was priced at, but it was not the only factor.

In January of 2008, a month after the closing, the Plaintiffs received word that the Children's Center could not pay its rent and that it would be vacating the property. Plaintiffs never received any rent from the Children's Center.[12]

The sum and substance of this case is that rent on the Children's Center was not being paid, that the Defendants appear to have taken pains to disguise such fact and keep it from becoming known to the Plaintiffs, and that the Plaintiffs obviously suffered substantial damages. It is no wonder that the Plaintiffs testified at trial that they would not have decided to purchase the property if they had known about the nonpayment of rent. O'Shea testified, "There is no way that we would have gone ahead with that deal had we known [the Children's Center had not paid rent for October, November and December of 2007]." This almost goes without saying.

All of the foregoing facts were presented in the Plaintiffs' opening brief, although not, perhaps, organized in the optimum order. At one point, after referencing the Children's Center balance sheet, the promissory note forgiven in exchange for the Estoppel Certificate, and the Children's Center's tax returns and profit and loss statement, Plaintiffs state:

> None of these documents "disclose[d] the inaccuracy of the representation[s]" that the Center had regularly paid its rent and was current. First, the August 28, 2007 balance sheet showed no more than that the Center owed a debt to Gordon and Jared Arave, but did not disclose that the debt was for unpaid rent. Second, Fife's statement to Needs did not disclose that rent had not been paid by the Center, or that the promissory note was for unpaid rent. Fife did not even know this fact. Third, the tax returns and profit and loss statement did not disclose that the Lease had been modified or that all monthly rent had not been paid. No other evidence was presented which "disclose[d] the inaccuracy of the representation[s]" made by High Mark.

---

[12] Although it does not appear in the trial record, in its decision on the Plaintiffs' motion for summary judgment, the district court noted:

> On October 3, 2008, Plaintiffs' counsel wrote a letter to Defendants offering to tender the Property back to Defendants in an attempt to rescind the purchase of the Property and return the Parties to their pre-contract positions. Defendants refused to rescind the purchase of the Property.

The Plaintiffs thereafter filed this suit seeking damages.

28

Likewise with respect to the allegations of actual fraud or fraud by nondisclosure, the District Court's failure to look at the evidence again affected its decision. The elements of materiality, knowledge of falsity, justifiable reliance, and resultant injury are all connected to whether or not the information made available to the Appellants actually disclosed the inaccuracy of the representations. A proper review of the documents by the District Court . . . would have revealed that the misrepresentations had not been disclosed.

The above wording is somewhat awkward, but it does address the fact that the Defendants failed to disclose the critical fact that rent was not being paid by the Children's Center. The Plaintiffs then say, "The verdict in favor of the Respondent High Mark Development, LLC, on the issues of breach of contract, fraud and fraud by nondisclosure, and against Gordon Arave on the issue of fraud by nondisclosure was not supported by substantial evidence and the District Court did not make the required inquiry into the matter." Further on, the Plaintiffs say, "the Court should have found Respondents High Mark and Gordon Arave liable for their fraudulent statements and failure to disclose the truth to the Appellants." They later state, "[a]t summary judgment, the District Court erred in its analysis of fraud by nondisclosure by failing to look at every circumstance under which a duty to disclose exists," and that:

High Mark had an affirmative duty to disclose the existence of promissory notes which materially altered the rent payment responsibilities of the Center, as stated in the Lease Agreement. These included not only the April 18, 2007 promissory note, but also the November 7, 2007 promissory note, signed after the Estoppel Certificate had been provided to Appellants. This "subsequent information" made High Mark's previous representation "untrue or misleading." High Mark also had a duty to disclose that "all minimum monthly rent" had in fact not been paid, in order "to prevent a partial or ambiguous statement of fact from becoming misleading." As previously stated, this "information . . . [was] not already in possession of the other party." High Mark knew, or should have known, that the false statements made in the Estoppel Certificate were "about to be relied upon," as the Certificate itself stated, "This certification is made with the knowledge that

29

it will be relied upon by Purchaser . . . in connection with financing and sales of the Property and the purchase of the Property by Purchaser." Due to these "objective circumstances," High Mark knew, or should have known, that the Appellants "would reasonably expect a disclosure of the facts."

Then, Plaintiffs devote almost three pages of their brief to a discussion of the elements of fraudulent nondisclosure, the duty to disclose, and why they believe the instruction given by the district court on this issue was inadequate under the circumstances of their case. Thus, it certainly appears that the Plaintiffs adequately raised the nondisclosure issue to the extent that it must be addressed by this Court.

The Defendants worked hard at trial to deflect attention from their failure to advise Plaintiffs of the important fact that the Children's Center had not paid rent to High Mark for August through December of 2006, or for the months of January, October and November of 2007, or that two promissory notes had been issued by the Children's Center in lieu of rent, or that the Children's Center had been induced to sign the false Estoppel Certificate in exchange for cancellation of the first rent-related note. Instead, the Defendants contend that the Plaintiffs received adequate information about the precarious financial condition of the Children's Center and that they should have been on notice that they could not count on receiving rental payments under the lease. However, when asked during oral argument before this Court why the Defendants had not advised Plaintiffs that the lessee was a deadbeat, Defendants' counsel pushed back, stating, in effect, that it was not a deadbeat, and that the Children's Center had made some rental payments, was consolidating its operations in the leased premises, growing its business, and ramping up operations. Counsel made this assertion twice during oral argument. In their brief, Defendants assert that "the rent concessions and resulting promissory notes were used to assist the Center in ramping up its operations or to assist it with cash flow," that the Center "was still growing its business at the [property] and had high expenses in 2006 as a result of growing its business," and that the Plaintiffs "clearly had this information." The Defendants can't have it both ways. Either the Children's Center was in such precarious financial difficulty that it likely could not pay rent or the business was merely experiencing growing pains and had no cause for concern. What is clear is that the Plaintiffs were never told about the nonpayment of rent. Indeed, in his closing argument to the jury, Defendants' counsel stated, "[Gordon] Arave did not feel it

was important—or High Mark did not feel it was important to disclose to the buyers that rent had not been paid in October and November. Why? It's because the Children's Center had told High Mark on multiple occasions that they were centralizing their operations in Idaho Falls." Perhaps it might have been appropriate to inform the Plaintiffs of the non-payment of rent and let them judge whether or not it was important to know of this critical defalcation.

Turning to the district court's decision on the Defendants' motion for JNOV or new trial, there are simply too many infirmities to justify affirmance. The manner in which the district court reached its conclusion and the evidence relied upon by the court in reaching the conclusion are troublesome.

On the issue of process, the district court did state the standards applicable to both JNOV and new trial. However, the analysis of the breach of contract issue mixed the two together, disregarding this Court's directive in *Quick v. Crane*, 111 Idaho 759, 767, 727 P.2d 1187, 1195 (1986), that "it is essential that if an alternative motion for a new trial is made with the motion for judgment n.o.v., the trial court must rule on both motions separately." Here, the district court referred to some evidence it thought might justify the jury verdict, observed that the court "may not necessarily agree with the jury verdict," and then concluded that "Plaintiffs are not entitled to JNOV or new trial on their breach of contract claim." This is not the type of analysis envisioned by the Court in *Quick v. Crane*.

Furthermore, several of the Court's findings were incorrect. The court incorrectly stated that the Defendants "put on evidence showing that they informed Plaintiffs prior to closing of the existence and purpose of the promissory notes," because, although the April 18, 2007 note was disclosed, the November 7, 2007 note was not, and there is no evidence in the record that the true purpose of either note was ever disclosed to Plaintiffs. Nor was the district court entirely correct in stating, "Fife also testified that he told Needs that a promissory note had been forgiven in exchange for the Center signing the Estoppel and releasing the Option." Fife did not know what the promissory note was for and was not aware that it was for nonpayment of rent or rent deferral.

The district court makes several references to the fact that the Plaintiffs had been given access to documents showing that the Children's Center was in precarious financial condition. That may be true but, as indicated above, the evidence was conflicting as to whether the financial stress was severe enough to impact the Children's Center's ability to continue paying rent. What

31

was never disclosed to the Plaintiffs, more importantly, is that the Children's Center had failed to pay numerous monthly rental payments and that two promissory notes had been given in lieu of eight month's rent. The true purpose of those notes was never disclosed to the Plaintiffs. Financial statements, tax returns, and other types of financial documents can be subject to manipulation and varying interpretations. The fact that rent is not being paid is a fairly clear-cut fact that cannot necessarily be manipulated, although, as shown here, it can be disguised. This real estate was being sold as income-producing property, it was purchased as income-producing property, and the value of the property was based on the ability of the property to produce income, but the income, i.e. the rent, was simply not being paid and received.

The district court speculates that the Defendants may have pursued the purchase despite the unfavorable financial condition of the Children's Center because of the potential benefits of a tax-deferred, like-kind exchange under 26 U.S.C. § 1031.[13] However, any evidence in this regard was equivocal in nature and it appeared during oral argument before this Court that counsel for neither party seemed to have a clear understanding of the requirements of such an exchange. What we do know for certain is that there was no disclosure by Defendants that eight months of rent had not actually been paid, as required by the lease, and that the Plaintiffs unequivocally stated that they would not have proceeded with the purchase if this fact had been disclosed. The Plaintiffs were never given the opportunity to take this important fact into account in making their decision as to whether to close the transaction. This case has similarity to *Watts v. Krebs* where we said, "a reasonable person under the circumstances would find the existence or nonexistence of standing timber with a worth in excess of $28,000 on rural property an important fact in determining whether to enter into an agreement to acquire the property." 131 Idaho at 620, 962 P.2d at 391. Here, any reasonable buyer would want to know, before concluding the purchase, whether property being sold and purchased as income-producing property was actually producing the income represented. Even viewing the evidence in the record in the light most favorable to the Defendants, I can only conclude that the trial court erred in failing to grant the JNOV motion.[14] The failure of the jury to award damages is virtually inexplicable.

---

[13] However, the district judge was aware that Plaintiffs had sought rescission of the contract ten months after closing, which would have deprived them of the benefit of the section 1031 tax deferral.

[14] Although one might ponder whether a claim for breach of the covenant of good faith and fair dealing is the appropriate mechanism for redress under the facts of this case, that issue was not brought to the Court on cross appeal.

After devoting about four pages of its decision to analysis of the breach of contract claim, the court dispatched both the misrepresentation and nondisclosure claims in somewhat less than one page, each. As with the contract claim, the district court failed to separately consider the JNOV motion and the new trial motion for the fraud claims, conglomerating them together. With regard to the new trial motion, the record does not disclose that the district court weighed the evidence and determined "(1) whether the verdict is against his . . . view of the clear weight of the evidence; and (2) whether a new trial would produce a different result." *Schwan's Sales Enters., Inc. v. Idaho Transp. Dept.*, 142 Idaho 826, 833, 136 P.3d 297, 304 (2006). The court did not disclose the evidence it considered in reaching its conclusions and, unlike with the breach of contract claim—where it stated, "[w]hile the Court may not necessarily agree with the jury verdict, the Court does not have a 'definite and firm conviction' that a mistake has been made"—it made no such observation with respect to either of the fraud claims. Since the elements of the fraud claims differ substantially from the elements of a breach of contract claim, one cannot necessarily import the required analysis for a contract claim into a fraud claim. The court was required to analyze the different types of claims, separately, considering the different elements involved.

The district court's analysis of the nondisclosure issue is somewhat confusing. It mistakenly characterizes the claim as a "constructive fraud" claim. Constructive fraud occurs when a party to a relationship of trust and confidence breaches a fiduciary duty. *Gray v. Tri-Way Const. Services, Inc.,* 147 Idaho 378, 386, 210 P.3d 63, 71 (2009). There is no claim of a fiduciary relationship in this case. The court then cites *Watts v. Krebs* for an eight-element cause of action, whereas *Watts v. Krebs* states the requirements of a fraud claim as: "That there was nondisclosure, that [Watts] relied upon Krebs' nondisclosure, that [Watts'] reliance was material to the transaction, and that [Watts] was damaged as a proximate result of the nondisclosure." 131 Idaho at 619, 962 P.2d at 390.

The district court then does a nine-line analysis, stating that the promissory notes were disclosed,[15] that other documents showed the Children's Center's financial problems and that the

---

[15] Again, the April 18, 2007 note was disclosed, but the purpose of that note was certainly not. There was never any disclosure to Defendants that the note was given in lieu of rent, a fact that Defendants' counsel acknowledged in his closing argument. He flatly stated that Gordon Arave talked to Paul Fife about the note but "he didn't tell him it was for rent deferral." It must be kept in mind that the income stream for income-producing property is critical to establish and maintain its value. There was no discussion of the fact that the fax from Paul Fife to Jeff Needs

jury could have concluded that the undisclosed information was not so vital that it should have been timely disclosed. The district court completely missed the point. How can it be said that the nonpayment of rent was not so vital that it need not have been disclosed? The court then found that substantial evidence supported the jury's decision. While that conclusion, if correct, might be sufficient to uphold denial of a motion for JNOV, it is not sufficient, in and of itself, to support the denial of a motion for a new trial. As we stated in *Quick v. Crane,* "the trial judge may set aside the verdict even though there is substantial evidence to support it." 111 Idaho at 767, 727 P.2d at 1195.

The district court's analysis of the misrepresentation claim is even more perfunctory, it is conclusory, and it is defective. After stating the elements of a fraud claim, the court devotes a total of six lines of analysis to the Plaintiffs' fraud claim. According to the district court, "Defendants presented evidence at trial wherefrom the jury could reasonably conclude that the false statements were not material,[16] that Plaintiffs knew about the falsity of the statements, that Plaintiffs did not rely on the false statements, that any reliance was not justifiable, or that there was no resultant injury." Again, the court found the decision "was supported by substantial evidence," and therefore held that Plaintiffs are not entitled to JNOV or a new trial. With regard to both fraud claims, the court clearly erred in finding that the Defendants had disclosed both promissory notes to the Plaintiffs.[17]

---

showed rent had been received for the property from 6/2006 through 7/2007 in the sum of $324,836; nor that the Araves had canceled the April 18, 2007 promissory note as an inducement to obtain the Children's Center's signature on the false Estoppel Certificate; nor that rent was not paid in the two months leading up to closing but, rather, put on to the November 7, 2007 promissory note, which was never disclosed.

[16] This conclusion seems to be at odds with the district court's ruling on summary judgment, wherein it found the statements in the Estoppel Certificate indicating that rent was current were "false" and that "[r]ent owed to High Mark in fact remained unpaid." The very premise of the contract claim was that these representations were material to the contract and they could not have been any less material to a claim of fraud.

[17] The analysis of the fraud claims was complicated by the nature of the special verdict form. The two fraud questions stated:

> Question No. 2: Did High Mark Development commit fraud, which was a proximate cause of damages to Plaintiffs?
>
> Answer: Yes_____ No_____
>
> Question No. 3: Did High Mark Development commit fraud by nondisclosure, which was a proximate cause of damages to Plaintiffs?
>
> Answer: Yes_____ No_____

It can hardly be said that the trial court carried out his responsibilities with regard to either the motion for JNOV or the motion for a new trial, a situation this Court can correct on appeal. With regard to the JNOV, "the parties are entitled to full review by the appellate court without special deference to the views of the trial court." *Quick v. Crane*, 111 Idaho at 764, 727 P.2d at 1192. In my view, the record does not contain evidence to support the jury's verdict on the nondisclosure claim. Nor does it appear, for purposes of the new trial motion, that the district judge "has actually given due consideration to the facts and circumstances of the case, and correctly applied the law thereto." *Id.* at 772, 727 P.2d at 1200. Furthermore, the district court failed to "distinguish between the various motions and the grounds upon which they are based," and "simply lump[ed] them all together and issue[d] a general grant or denial." *Id.* at 773, 727 P.2d at 1201.

While the Plaintiffs may not have acted in an exemplary manner in this case, there is no ground to excuse the fraud perpetrated against them.[18] It is clear that the Plaintiffs could have exercised more diligence in determining the financial strength of the Children's Center,[19] in presenting their case to the jury, and in articulating their case on appeal. O'Shea's testimony

---

It is impossible to tell from these compound questions whether the jury might have concluded that High Mark did or did not commit fraud or, if it did, whether fraud was a proximate cause of damages. Because of the multiple possibilities, the district court should have devoted more than a total of 15 lines to analyzing both fraud claims under both motions.

[18] Nor can the fraud be excused or mitigated by virtue of the Children's Center's undisclosed problems with the Board of Medicine or Medicaid cutbacks.

[19] Even though the Plaintiffs could have exercised more diligence in determining the financial condition of the Children's Center, they were not obligated to do so. As the Court noted in *Watts v. Krebs*, citing *Sorenson v. Adams*, 98 Idaho 708, 571 P.2d 769 (1977), the "purchasers' failure to investigate a misstatement of tillable acreage made in a document given to them by the vendor did not negate their right to rely on the misstatement." 131 Idaho at 621, 962 P.2d at 392. The Court continued:

> In noting that "silence, in circumstances where a prospective purchaser might be led to harmful conclusions, is a form 'representation,'" the Court concluded that the vendor's failure to say anything when he gave the purchasers the document containing the misstatement of tillable acreage amounted to a misrepresentation. The fact that the purchasers could have checked the accuracy of the figures by visiting the tax assessor's office, did not negate the purchasers' right to rely on the figures.

*Id.* Here, the Plaintiffs had the right to rely on the representations made in the Estoppel Certificate and other documents, which purported to show the rent had been paid and was current. No warning or disclosure was provided in any of these documents, indicating that promissory notes had been issued in lieu of rental payments.

regarding the financial documents was somewhat shaky and inconsistent in places, which may have caused the jury to lose some confidence in him. However, the infirmities in his testimony dealt with peripheral issues, such as when he received this or that document, the particulars of the 1031 exchange possibility, and the like. They did not address the critical issues—was the Children's Center really paying its rent, had High Mark actually received $324,836 as rental for the property from June 2006 through July 2007, what was the real purpose of the April 18 promissory note, and had the Children's Center failed to pay rent following execution of the Estoppel Certificate? It cannot be contended by the Defendants that they disclosed information critical to the value of the property—the income stream being received by High Mark from the Children's Center. When one is selling income-producing property to a buyer wanting that kind of property, it is critical that the seller disclose that rent is not being paid as required by the lease, and it is more important that the buyer not take steps to conceal this critical fact. I simply cannot find that incautiousness on the part of the Plaintiffs overrules the obvious fraudulent design of the Defendants in this matter.

The district court failed to carry out its responsibilities in analyzing the Plaintiffs' claims, either under a JNOV standard or a new trial standard. Thus, I would reverse and, at a minimum, remand the case for a new trial.


Justice W. JONES CONCURS.